# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FREE GREEN CAN, LLC *et al.*,<br><br>       Plaintiffs/Counter-Defendants,<br><br>       v.<br><br>GREEN RECYCLING ENTERPRISES, LLC,<br><br>       Defendant/Counter-Plaintiff. | Case No. 10-cv-5764<br><br>Judge Sharon Johnson Coleman<br><br>Magistrate Judge Jeffrey T. Gilbert |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on separate motions by Counter-Defendant Michael Menas ("Menas") and Plaintiffs/Counter-Defendants Free Green Can, LLC and FGC Franchise LLC (collectively the "Free Green Entities") to dismiss the amended counterclaims filed by Defendant/Counter-Plaintiff Green Recycling Enterprises, LLC. ("GRE"). For the reasons that follow, the Court grants Menas's motion in its entirety. The Court also grants the motion by the Free Green Entities in part and denies it in part.

## FACTUAL BACKGROUND

The following relevant factual allegations are drawn from the parties' pleadings and are presented in the light most favorable to GRE, the non-moving party. Plaintiff/Counter-Defendant Free Green Can LLC ("Free Green Can") developed a recycling concept whereby Free Green Can franchises place dual purpose recycle and trash bins at host-site venues and sell advertising rights on those bins to third-parties. (Am. Countercl. ¶ 2.) Developing the recycling business concept is time and labor intensive and requires tremendous effort to demonstrate that recyclables can be efficiently processed and that the advertisements are profitable. (*Id.*) This "Green Can" recycling concept is new, has no provable business plan, and GRE is currently the

sole franchisee. (*Id.* at ¶ 3.)

In June or July 2009, Dan Morrissey ("Morrissey") and Steve Holland ("Holland"), acting as agents of the Free Green Entities[1], approached Dedric Gill, a Nebraskan entrepreneur, seeking his assistance in growing the Green Can business. (*Id.* at ¶ 17.) Initially, Morrissey and Holland sought Gill's help to secure funding for the Green Can business. (*Id.* at ¶ 20.) Shortly thereafter, Morrissey and Holland began to focus on finding business partners or franchisees to sign up host sites for the dual purpose bins. (*Id.* at ¶ 21.) Gill and his business partners insisted that a franchise model would not work because there was no proof that a viable market existed for the Green Can recycling concept. (*Id.* at ¶ 22.) In August 2009, Morrissey and Holland asked Gill and his business partners to enter a "reservation" agreement to help prove and refine the business model through the placement of 100 Green Can bins. *(Id.)* Gill and his associates agreed to the arrangement and formed GRE as a Nebrasaka limited liability corporation to begin generating interest among potential host sites in the Omaha, Nebraska area. (*Id.* at ¶ 23.)

After GRE began developing potential host sites for the bins, Morrissey and Holland pressured GRE to enter into a franchise agreement with the Free Green Entities. (*Id.* at ¶ 24.) Morrissey and Holland insisted that should GRE fail to sign the agreement, that the Free Green Entities would sell the franchise to some other organization and GRE would lose the opportunity to capitalize on the interest it had already generated. (*Id.* at ¶ 25.) GRE reluctantly agreed to become a franchisee and the parties executed a franchise agreement on September 28, 2009 notwithstanding the fact that the Free Green entities did not complete the franchise disclosures as required under Nebraska law. (*Id.* at ¶¶ 5-6.) GRE paid the Free Green Entities $125,000 for its franchise and agreed to use its best efforts to purchase 250 Green Cans per year. (*Id.* at ¶ 36.)

GRE alleges that its decision to become a Free Green franchise was based on a number of

---

1 The Free Green Entities are Illinois limited liability companies. (Dkt. No. 23 ¶¶ 4-5.)

representations made by the Free Green Entities which later proved to be false. (*Id.* at ¶¶ 27, 35.) The Free Green Entities allegedly gave GRE the first right of refusal for franchises in the states of Kansas, Missouri, Oklahoma, Iowa, and Minnesota. (*Id.* at ¶ 28.) The Free Green Entities also informed GRE that it would be free to place Green Cans in any state that did not have a Free Green Can franchise. (*Id.* at ¶ 29.) The Free Green Entities represented to GRE that the cans were of the highest quality and had been stress-tested to withstand ordinary use during the harsh winters of the Midwest. (*Id.* at ¶ 30.) GRE was told that the Green Cans were designed for both trash and recycling and that they would incur a contamination rate of no more than 7%, which would make recycling feasible. (*Id.* at ¶ 32.) The Free Green Entities claimed to have relationships with waste management companies that could assist GRE in managing the waste in the bins GRE distributed. (*Id.* at ¶ 33.) Finally, the Free Green Entities told GRE that the two organizations would work together to revise the franchise documents and shape the Green Can business. (*Id.* at ¶ 34.)

Several changes concerning the franchise agreement took place immediately after the agreement was executed on September 28, 2009. (*Id.* at ¶¶ 37-39.) The following day, Plaintiff/Counter-Defendant Free Green Can formed FGC Franchises, LLC ("FGC") and transferred the franchise agreement with GRE to FGC. (*Id.* at ¶¶ 37-38.) The Free Green Entities then began considering modifications to the franchise agreement. (*Id.* at ¶ 39.) In November 2009, Morrissey admitted that the franchise documents were flawed and should be amended to properly reflect the parties' needs. (*Id.* at ¶¶ 42-43.) The parties engaged in extensive and sometimes inconsistent discussions concerning the terms of the new franchise agreement. (*Id.* at ¶¶ 46-48.) GRE attributes the inconsistent negotiating positions to a controlling investment that Menas made in the Free Green Entities in early 2010. (*Id.* at ¶ 49.)

GRE alleges that Menas's investment saved the Free Green Entities from financial disaster and that Menas then dramatically changed the course of dealings between the parties. (*Id.*)

Between February and April 2010, GRE learned of several design flaws in the Green Cans. (*Id.* at ¶¶ 50-51.) Despite the Free Green Entities' representation of a 7% contamination rate, GRE experienced contamination rates of over 40%. (*Id.* at ¶ 50.) This level of contamination made it impossible for items deposited in the bins to be recycled and required GRE to hire an expert to address the issue. (*Id.* at ¶ 50.) Other problems with the Green Cans surfaced including poorly attached lids, problematic advertising attachment and replacement procedures that limited the purported five year life span, and warping and cracking that made it impossible to place professional grade advertisements on the cans. (*Id.* at ¶ 51.) GRE alleges that the cans were not fit for their intended purpose and that the Free Green Entities did not have sufficient data when it made the representations to GRE about the quality of the cans. (*Id.* at ¶ 52.) The Free Green Entities proposed a retro-fit for the cans to address the contamination issue but the retro-fit did not solve the problem. (*Id.* at ¶ 53.) The relationships that the Free Green Entities claimed to have in the waste management business could not address the contamination issue nor were they able to assist GRE with waste management. (*Id.* at ¶ 54.) Then in May and June 2010, the Free Green Entities began shipping cans to GRE, albeit slowly, and the majority of the cans shipped were used cans rather than the new cans that the Free Green Entities had promised. (*Id.* at ¶ 55.)

In June or July 2010, Menas informed GRE that it could not place Green Cans and sell advertising space in Minnesota. (*Id.* at ¶ 56.) On September 10, 2010, the Free Green Entities filed the instant action seeking injunctive relief and damages alleging that GRE engaged in trademark infringement and unfair competition. (Dkt. No. 1.) The Free Green Entities sought

declaratory relief that the franchise agreement was valid and enforceable, alleged GRE breached the agreement, and sought specific enforcement. (*Id.*)

On December 27, 2010, GRE filed the amended counterclaims that are the subject of the instant motions. (Dkt. No. 46.) The counterclaims allege that the Free Green Entities had no viable business plan or model and that GRE expended significant time and financial resources to develop the Green Can concept that the Free Green Entities purport to be franchising. (*Id.* at ¶¶ 58-61.) GRE claims that it would not have incurred these expenses absent the representations made by the Free Green Entities which GRE alleges are "flat-out, knowing, falsehoods." (*Id.* at ¶¶ 57, 62.) GRE alleges that Menas is using the Free Green Entities to steal the "viable, provable, and potentially profitable business model for the 'Free Green Can' recycling concept" that GRE alleges it developed. (*Id.* at ¶¶ 60, 64.) GRE also claims, upon information and belief, that Menas has commingled his fortunes with those of the Free Green Entities and that he has become the Free Green Entities' alter ego. (*Id.* at ¶¶ 69-71.) GRE further claims that Menas has caused the Free Green Entities to engage in a "scheme or artifice to defraud" GRE. (*Id.* at ¶ 98.) The counterclaims are set forth in four counts alleging: (1) a violation of the Nebraska Seller-Assisted Marketing Plan Act; (2) a violation of the Nebraska Consumer Protection Act; (3) a violation of the Nebraska Deceptive Trade Practices Act; and (4) breach of warranty. (*Id.* at pp. 15-23.)

In his motion, Menas seeks dismissal of all claims against him arguing that all of the misconduct alleged in the amended complaint is attributed to the Free Green Entities, Morrissey or Holland. (Dkt. No. 55. p. 1.) The Free Green Entities seek dismissal of counts I and II of the amended counterclaim arguing that GRE has failed to state a claim under the applicable statutory provisions.

# LEGAL STANDARD

### 1. Motions Pursuant to Rule 12(b)(6)

A motion under Rule 12(b)(6) challenges the sufficiency of complaint or counterclaim to state a claim upon which relief may be granted. *Christensen v. County* of Boone, 483 F.3d 454, 458 (7th Cir. 2007). When evaluating the sufficiency of a counterclaim, a district court must construe it in the light most favorable to the nonmoving party. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Under the Federal Rules of Civil Procedure, a counterclaim must contain a "short and plain statement of the claim" showing that the pleader is entitled to relief. *See* Fed. R. Civ. P. 7(a), 8(a). Additionally, the allegations in the counterclaim must plausibly suggest that the pleader has a right to relief, raising that possibility above a speculative level. *See, e.g., Wilson v. Price*, 624 F.3d 389, 391-92 (7th Cir. 2009). If they do not, the party pleads itself out of court. *Id.* at 392. For a claim to have facial plausibility, a party must plead sufficient factual content that allows the court to draw the reasonable inference that its opponent is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### 2. Pleading Requirements Pursuant to Rule 9(b)

The heightened pleading standard set forth in Rule 9(b) requires that in all allegations of fraud, "a party must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). This means a party must plead "the who, what, when where, and how: the first paragraph of any newspaper story." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). The particularity requirement of Rule 9(b) is designed to discourage a "sue first, ask questions later" philosophy. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). The heightened pleading requirement in the

fraud context forces parties to conduct a careful pretrial investigation and minimizes the risk of extortion that may come from a baseless fraud claim. *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 748-49 (7th Cir. 2005). Further, particularity is required, in part, because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such allegations are not lightly leveled. *Pirelli*, 631 F.3d at 442.

## DISCUSSION

### 1. Counterclaims Against Menas

Menas seeks dismissal of the counterclaims arguing that they fail to state a plausible cause of action against him. (Dkt. No. 55. pp. 1-2.) Menas argues that the allegations against him are few and far between and are then conclusory at best. (*Id*. at p. 2.) Menas contends that the counterclaims allege only that he is an "angel investor" with substantial control over the Free Green Entities and that he has "commingled his fortunes with those of the Free Entities." (*Id*.) Menas notes, however, that GRE has failed to provide any factual support for these allegations and thus GRE has not met the pleading requirements under Rule 8(a). (*Id.*) Further, Menas claims that there is no legal basis to hold him liable as an investor for the alleged prior misconduct of the Free Green Entities. (*Id*. at p. 3.) Finally, Menas argues that GRE has not alleged any basis to pierce the corporate veil of the Free Green Entities and hold Menas personally liable under an alter ego theory. (*Id*. at p. 5.) GRE counters that Menas may be held liable for any harm that he personally perpetuated, that it can hold Menas liable under an alter ego theory, and that its counterclaims are pled with sufficiency under both Rule 8(a) and 9(b). (Dkt. 64 p. 3.)

As an initial matter, the Court notes that while GRE alleges Menas has become the alter ego of the Free Green Entities, GRE has not sufficiently set forth allegations to warrant piercing the corporate veil of limited liability. Courts are reluctant to pierce the corporate veil and will only do so where: (1) there is such a unity of interest and ownership that separate personalities of the corporation and the individual no longer exist; and (2) where adherence to the fiction of separate corporate existence would promote injustice or inequity. *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004). GRE has not met its obligation to establish a unity of interest between Menas and the Free Green Entities. The amended counterclaims allege only that Menas has made significant financial investments in the Free Green Entities and directs their wrongdoing. (Am. Countercl. ¶¶ 66-68.) In an attempt to state an alter ego claim, GRE alleges "upon information and belief" that Menas has commingled his fortunes with those of the Free Green Entities and has used the Free Green Entities to cover his personal expenses. (*Id.* at ¶ 69.) Yet GRE has alleged no facts to support these conclusory allegations. Thus, GRE has failed to raise its alter ego claims beyond the speculative level. The Court denies GRE's request to pierce the corporate veil and hold Menas liable under an alter ego theory.

**A. Count I – Violation of the Nebraska Seller-Assisted Marketing Plan Act**

In Count I, GRE seeks a declaratory judgment that Menas and the Free Green Entities violated the Nebraska Seller-Assisted Marketing Plan Act (the "SAMP Act") by failing to provide GRE with the proper disclosures when the parties entered the franchise agreement. (Am. Countercl. pp. 15-17.) The intent of SAMP is to "provide each prospective seller-assisted marketing plan purchaser with the information necessary to make an intelligent decision regarding seller-assisted marketing plans being offered." NEB. REV. STAT. § 59-1701(2) (West

2011). The Act requires a seller to provide a potential purchaser with a written disclosure document during the first in-person communication. *Id.* at § 59-1732. Accordingly, any non-compliance with the SAMP Act's disclosure provision must occur at the time of the first in-person communication. GRE alleges that the Free Green Entities failed to provide GRE with a franchise disclosure document when the parties met to execute the franchise agreement on September 28, 2009. (*Id.* at ¶¶ 6, 24, 26, 35.) By all accounts Menas did not become involved with the Free Green Entities until early 2010. (*Id.* at ¶ 49.) Thus, if the Free Green Entities violated the SAMP act by failing to provide the required disclosures, the violation occurred several months before Menas could have been personally involved in the alleged non-disclosure. Without any further allegations referencing Menas in count I, the Court finds that the amended counterclaim fails to state a claim under the SAMP Act as to Menas and hereby dismisses this count against him.

### B. Count II – Violation of the Nebraska Consumer Protection Act

GRE alleges in count II of its counterclaim that Menas and the Free Green Entities violated the Nebraska Consumer Protection Act and engaged in unfair and deceptive acts by making "knowing misstatements" and by violating the SAMP Act. (*Id.* at ¶¶ 82-84.) The "knowing misstatements" of which GRE complains include representations that the Green Cans suffered only 7% contamination (*id.* at ¶ 84), the cans had been stress-tested to withstand the harsh Midwest winters (*id.* at ¶ 31), the Free Green Entities had relationships with multiple waste management companies to assist GRE (*id*. at ¶ 33), and the Free Green Entities would "work with" GRE to revise the franchise documents as the parties continued to shape the Green Can business model together (*id.* at 34). Like the alleged violation of the SAMP Act, these representations were made prior to Menas's investment in the Free Green Entities in early 2010.

The only allegations involving Menas as set forth in count II allege that he caused the Free Green Entities to "seek to foreclose" GRE from the marketplace and that Menas insisted that GRE abide by the franchise agreement. (*Id*. at ¶¶ 90-92.) GRE provides no factual support for its assertion that Menas is seeking to use unfair and deceptive marketing efforts to close GRE out of the marketplace. Additionally, this allegation conflicts with GRE's allegation that Menas insists that GRE abide by the franchise agreement, which is the very mechanism that provides for GRE's participation in the Green Can recycling business. GRE has failed to allege any facts to support its claim that Menas engaged in conduct that violates the Nebraska Consumer Protection Act. Conclusory allegations such as those alleged here do not meet the pleading standards as set forth in *Twombly*. *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949. Thus, this Court also dismisses count II as to Menas because it fails to state a facially plausible claim.

**C. Count III – Violation of Nebraska's Deceptive Trade Practices Act**

In Count III, GRE alleges Menas has caused the Free Green Entities to engage "in a scheme or artifice to defraud" GRE to obtain money from GRE by "lying about the nature of the Free Green Can franchise, the quality of the Cans, and Free Green Entities' willingness to negotiate the franchise agreement as the business plan began to take shape." (*Id.* ¶ 98.) GRE further alleges that Menas and the Free Green Entities have used this same scheme or artifice to eliminate GRE as a competitor. (*Id.* at ¶ 99.) Once again, GRE attempts to hold Menas accountable for alleged acts that were undertaken prior to his involvement with the Free Green Entities. The representations were made and the franchise fees were paid long before Menas had any role with the Free Green Entities. Moreover, allegations involving fraud must meet the particularity requirement under Rule 9(b). GRE has failed to allege the who, what, when, where, or how Menas fraudulently obtained any money from GRE or pushed GRE out of the

marketplace. While GRE alleges that Menas informed GRE that it could not place cans in Minnesota, GRE fails to allege any of the particulars that establish how this act was fraudulent. GRE did not plead the allegedly fraudulent scheme in accordance with Rule 9(b) and thus it fails to state a claim against Menas under Nebraska's Deceptive Trade Practice Act. The claim also fails because members and managers of Illinois limited liability companies ("LLC") cannot be held personally liable for acts of the LLC. *See Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 959 (1st Dist. 2008); 805 ILC 180/10-10(a) (West 2011). Thus, the Court dismisses count III of the counterclaim against Menas as well.

### D. Count IV – Breach of Warranty

In Count IV, GRE asserts a claim for breach of the implied warranty of fitness for a particular purpose. (Am. Countercl. pp. 22-23.) This claim alleges the Free Green Entities knew and understood that GRE required that the Green Cans be fit for a number of purposes and that GRE relied upon the Free Green Entities' representations that the cans met these requirements when the parties executed the franchise agreement. GRE has alleged no basis to hold Menas liable for the breach of warranty claim. None of the allegations involve Menas as all of the acts complained of occurred prior to his investment in the Free Green Entities. Count IV fails to state a claim against Menas and hence the Court also dismisses this claim.

### 2. Counterclaims Against the Free Green Entities

The Free Green Entities seek dismissal of counts I and II of the amended counterclaims claiming that GRE has failed to sufficiently plead these statutory claims. GRE counters that it has met the liberal pleading standards for these claims. The Court turns now to consider each claim.

### A. Count I - Violation of the Nebraska Seller-Assisted Marketing Plan Act

The Free Green Entities argue that they cannot be held liable for violating the SAMP Act because they are not "sellers" as that term is defined under the Act. (Dkt. No. 52 pp. 2-3.) The SAMP Act regulates the conduct of "sellers" defined as any person who sells or leases or offers to sell or lease a seller-assisted marketing plan and:

> (1) Has sold, leased, represents, or implies that the seller has sold or leased, whether in Nebraska or elsewhere, at least five seller-assisted marketing plans within twenty-four months prior to a solicitation; or
>
> (2) Intends, represents, or implies that the seller intends to sell or lease, whether in Nebraska or elsewhere, at least five seller-assisted marketing plans within twelve months following a solicitation.

NEB. REV. STAT. § 59-1705. The Free Green Entities argue that they have never sold, leased, offered to sell or lease, or implied that they have sold or leased any other business in the two years prior to the execution of the franchise agreement. (Dkt. No. 52 p. 3.) They also argue that GRE has conceded that it is the Free Green Entities only franchisee. (*Id.*) In response, GRE argues that the Free Green Entities alleged in their complaint that the Free Green Can concept "is now franchised across the country" and that FGC Franchises, LLC "was established for the purpose of franchising the Free Green Can business concept." (Dkt. No. 23 ¶ 6.) At this stage of the proceedings, it is inappropriate for the Court to make a factual determination regarding whether the Free Green Entities intended to sell more than five franchises. *See, e.g., Int'l Mkt'g, Ltd. v. Archer Daniels Midland Co.*, 192 F.3d 724, 730 (7th Cir. 1999). Drawing all reasonable references in GRE's favor as the non-moving party, the Court finds that the GRE has stated a plausible claim that the Free Green Entities violated the SAMP Act by failing to provide the required disclosures. As such, the Court denies the Free Green Entities' motion to dismiss count I of the amended counterclaim.

**A. Count II – Violation of the Nebraska Consumer Protection Act**

The Free Green Entities claim count II should be dismissed because their alleged wrongful acts did not directly or indirectly affect the people of the state of Nebraska. (Dkt. No. 52 pp. 3-4.) The Nebraska Consumer Protection Act (the "CPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602. The Nebraska Supreme Court has held that the CPA only reaches conduct that "directly or indirectly affect[s] the people of the State of Nebraska." *Nelson v. Lusterstone* Surfacing Co., 605 N.W.2d 136, 141-42 (Neb. 2000) ("[t]o be actionable under the CPA, therefore, we conclude that the unfair or deceptive act or practice must have an impact upon the public interest. The act is not available to redress a private wrong where the public interest in unaffected."). Nebraska courts have refused to apply the CPA to isolated transactions between individuals that did not have an impact on consumers at large. *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 36 (Neb. 2004).

In its amended counterclaims GRE has failed to allege that any alleged wrongdoing by the Free Green Entities had any impact on consumers in Nebraska as required under the CPA. The counterclaims allege harm only to GRE and seek relief only on GRE's behalf. GRE complains of a troubled business transaction between the parties to this action only. In its reply, GRE argues that the alleged violation of the SAMP Act serves as the basis for establishing the requisite public interest impact under the CPA because the provisions of the SAMP Act are "necessary for the public welfare." (Dkt. No. 64 p. 10.) This argument fails because the alleged violation of the SAMP Act here only impacts GRE as the sole Free Green Can franchisee who did not receive the required written disclosure. Further, in its amended counterclaim spanning 107 paragraphs, GRE fails to allege that the Free Green Entities acted in any way to directly or

indirectly harm the public interest in Nebraska.  The Court finds that GRE has failed to state a claim under the CPA because GRE has not alleged any impact on consumers in Nebraska.  Count II of the amended counterclaim is hereby dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court grants the motion to dismiss by Defendant Menas in its entirety and dismisses all claims against him.  The Court denies the motion by GRE to dismiss count I and grants the motion to dismiss count II of the amended counterclaim.

IT IS SO ORDERED.

_____  
Dated: June 20, 2011

Honorable Sharon Johnson Coleman  
United States District Court